AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) Case No. 2:16mj202 |
| Facebook Inc. 1601 Willow Road Menlo Park, California 94025 | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Facebook accounts stored at premises owned, maintained, controlled, or operated by Facebook Inc., 1601 Willow Road, Menlo Park, California 94025: 1) Facebook account Aborshad Aborashaad (100007419253652) and 2) Facebook account (100003905470077) عدنان الابرش

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

(See Attachment B)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 2339B | Providing material support or resources to designated FTOs |
| 18 1001 | False statements involving international terrorism |

The application is based on these facts:

(See Attached Affidavit)

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Stephen L. Flowers, FBI Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 27, 2016

_____
*Judge's signature*

City and state: Columbus, Ohio

U.S. Magistrate Judge Elizabeth Preston Deavers
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR: <br><br> 1: **FACEBOOK ACCOUNT** Aborshad Aborashaad (100007419253652); and <br><br> 2: **FACEBOOK ACCOUNT** الابــرش عـدنان (100003905470077) | Case No. 2:16mj202 <br><br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Stephen L. Flowers (hereinafter "Affiant"), being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I make this affidavit in support of an application for a search warrant for all content and transactional records for the following accounts from the date each was established through April 27, 2016:

a) Facebook User ID Aborshad Aborashaad (100007419253652);

b) Facebook User ID الابــرش عـدنان (100003905470077); and

These account items are believed to be stored at premises owned, maintained, controlled, or operated by Facebook Inc., 1601 Willow Road, Menlo Park, California 94025 (hereinafter referred to as "Facebook" and described in Attachment A). This affidavit is made in support

1

of an application for a search warrant under Title 18, United States Code, Sections 2703(a), (b)(1)(A), and (c)(1)(A) to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B according to the filter procedures protecting any privileged information described in Attachment C.

2) The Affiant is a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") assigned to the Columbus Resident Agency, Columbus, Ohio, and has been an FBI SA for 19 years. The Affiant has been involved in the preparation and execution of numerous federal search warrants for various types of violations. The Affiant is currently assigned to the FBI Joint Terrorism Task Force ("JTTF") where he has been a Case Agent, Co-Case Agent, or Supervisory SA for numerous International Terrorism investigations for the past 13 years. The Affiant was also the Case Agent for a number of computer-related investigations for approximately five years prior to that. During that entire time period the Affiant has received specialized training in International Terrorism and computer-related crime.

3) The statements contained herein are based on investigation conducted by the Affiant, on his experience and training as an SA of the FBI, and on other relevant information provided to him by other JTTF FBI Agents and Task Force Officers ("TFO"). The Affiant is not sharing each and every fact known to him concerning this investigation but only the facts which he

2

believes are necessary to establish probable cause for the seizure of evidence.

4) I allege the facts to show there is probable cause to believe that fruits, instrumentalities, and evidence of offenses involving violations of: (i) Title 18 U.S.C. § 2339B (Providing and Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization al-Nusrah Front), and (ii) Title 18, United States Code § 1001, false statements involving international or domestic terrorism; which may be found within the social media accounts believed to be stored at premises controlled by Facebook which are described in Attachment A.

## BACKGROUND INFORMATION - Designated Foreign Terrorist Organizations

5) On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

6) On December 11, 2012, the Secretary of State amended the designation of AQI to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.

7) On May 15, 2014, the Secretary of State, in response to the evolving nature of the relationships between ANF and AQI, amended the FTO designation of AQI to remove all

3

aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, also known as Jabhet al-Nusra, also known as The Victory Front, also known as Al-Nusrah Front for the People of the Levant, also known as Al-Nusrah Front in Lebanon, also known as Support Front for the People of the Levant, and also known as Jabahat al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

8) Relative to this affidavit, it is noted that both al-Qa'ida and the Islamic State of Iraq and the Levant ("ISIL") are also the names of organizations that have been designated by the United States Department of State as FTOs under section 219 of the Immigration and Nationality Act. Another name for ISIL is the Islamic State of Iraq and Syria ("ISIS").

**OVERVIEW**

9) FBI investigation determined that Abdifatah Aden (hereinafter "ADEN"), a Columbus, Ohio resident, departed the United States ("U.S.") in May of 2013 and began fighting in Syria for ANF in approximately August of 2013 to on or about June 2, 2014, when he was killed in battle. ADEN provided assistance to his brother Abdirahman Sheik Mohamud (hereinafter "MOHAMUD"), place of birth Somalia and a Columbus, Ohio resident, to travel to Syria in approximately April of 2014 where MOHAMUD joined ANF. MOHAMUD's subsequent activity upon return to the U.S. in June of 2014 included recruiting individuals in an attack on

4

U.S. military or other uniformed personnel. On April 16, 2015, MOHAMUD was indicted in the Southern District of Ohio for one count each of the following: 18 U.S.C. § 2339A (Providing Material Support to Terrorists), 18 U.S.C. § 2339B (Providing Material Support to a Designated Foreign Terrorist Organization – al-Nusrah Front), and 18 U.S.C. § 1001(a)(2) (False Statement Involving International Terrorism). Currently under seal of the court, on August 14, 2015 MOHAMUD entered a plea of guilty to all three counts of the indictment pursuant to signed plea agreement.

10) The FBI continues to investigate multiple co-conspirators who MOHAMUD both recruited for his domestic plot and influenced to travel to Syria for the purpose of training and fighting with an FTO. One of these individuals is Abdiqani Abdi Aden (hereinafter "ABDIQANI"), born a Somali-Kenyan and a Columbus, Ohio resident. ABDIQANI has direct association to Facebook User ID Aborshad Aborashaad (100007419253652) who, as illustrated below, directly coordinates with Facebook User ID عدنان الابـرش (100003905470077) on facilitation of travelers to Syria to join FTOs.

## STATEMENT OF PROBABLE CAUSE

11) Through an investigation of MOHAMUD, the FBI learned the following:

In September of 2013, MOHAMUD sent his brother, Abdifatah ADEN, a private message praising his brother Abdifatah ADEN, who was fighting in Syria, for being a soldier and committing himself to join ADEN as a fellow foreign fighter.

From approximately January through April of 2014, MOHAMUD and ADEN coordinated MOHAMUD's travel into Syria, planned MOHAMUD's financial support for ADEN, and discussed MOHAMUD's plans to obtain a communication device to provide to ADEN in support of terrorist activities. MOHAMUD's planning included obtaining a

U.S. passport and airline ticket, opening a bank account, gathering $ 1,000 of funds on ADEN's behalf, and purchasing an internet-accessible device.

MOHAMUD departed the U.S. on April 18, 2014 for the purpose of fighting in Syria and providing material support to the al-Nusrah Front ("al-Nusrah"), an organization that is designated by the U.S. Secretary of State as a foreign terrorist organization (FTO).

While in Syria, MOHAMUD trained with individuals associated with al-Nusrah on fitness, and the use of weapons.

However, MOHAMUD was instructed by al-Nusrah to return to the U.S. and commit an act of terrorism.

MOHAMUD returned to the U.S. on June 8, 2014.

After returning to the U.S., MOHAMUD began to plan the kidnapping and murder of U.S.-based soldiers. MOHAMUD attempted to recruit multiple individuals to participate with him in a violent attack in the U.S.

12) MOHAMUD was interviewed by the FBI multiple times from approximately August 13, 2015 through October 13, 2015 with the intention of receiving some consideration for the information provided. The following are summaries of statements made by MOHAMUD during two of those interviews on September 8, 2015 and October 1, 2015:

a) Upon his return to the U.S. in June of 2014, MOHAMUD recruited or attempted to recruit multiple Columbus, Ohio residents in a plot to free U.S. prisoner Aafia Siddiqui ("SIDDIQUI") by either attacking her prison in Ft. Worth, Texas or kidnapping and murdering U.S. soldiers as a ransom to have her released (hereinafter "Domestic Plot"). One of those recruits was ABDIQANI.

b) From approximately June of 2014 through January of 2015, MOHAMUD met with identified co-conspirators, including ABDIQANI, to discuss his (MOHAMUD's)

6

domestic plot and also traveling to Syria to join ISIS or ANF.

c) Actions and discussion by MOHAMUD's co-conspirators, including ABDIQANI, in
   furtherance of MOHAMUD's domestic plot or traveling to Syria included the following:

   i) ABDIQANI and other identified co-conspirators stated they were willing to do
      something if they could "get away with it."

   ii) ABDIQANI and other identified co-conspirators said the group should train on how
      to use a gun.

   iii) ABDIQANI already possessed a gun which he (ABDIQANI) stated could be used in
      their plot.

   iv) ABDIQANI and other identified co-conspirators were aware MOHAMUD was
      attempting to obtain a second gun for use in their plan through Unnamed Associate
      #1.

   v) ABDIQANI and other identified co-conspirators swore allegiance to MOHAMUD as
      their emir, or leader. This pledge was based on what MOHAMUD told them he
      learned while in Syria.

   vi) MOHAMUD provided multiple examples of the group's use of their individual smart
      phones to further their conspiracy, including using the messaging feature of their
      Facebook applications to contact each other regarding times to meet.

d) After leaving Syria, MOHAMUD communicated with an ANF linked facilitator through
   Facebook.

13) On February 4, 2016, MOHAMUD provided information regarding ABDIQANI's interest in

traveling to Syria that included the following:

a) ABDIQANI knew MOHAMUD was going to go meet with his brother [ADEN] before he (MOHAMUD) left to go overseas. ABDIQANI knew ADEN was in Syria before MOHAMUD left.

b) MOHAMUD said he communicated with ABDIQANI on Snapchat while he was in Syria. MOHAMUD told ABDIQANI how nice it was in Syria and ABDIQANI asked him (MOHAMUD) how much he (ABDIQANI) would need to come to Syria. MOHAMUD told ABDIQANI that he might go train while he was in Syria.

c) After MOHAMUD came back, he talked to ABDIQANI a lot of different times about how to get into Syria. MOHAMUD told ABDIQANI that he (MOHAMUD) faked the trip to make it look like he was going to Greece. MOHAMUD told ABDIQANI and other named individuals the easiest way to enter Syria was through Turkey.

d) MOHAMUD also told ABDIQANI and other identified co-conspirators about his brother's friend Nidal al-Akidi (hereinafter "ALAKIDI"). [ALAKIDI is one of the foreign-based facilitators who helped MOHAMUD travel into Syria and is discussed below.] ABDIQANI and the other identified co-conspirators all knew MOHAMUD was connected with ALAKIDI on Facebook and that he (MOHAMUD) would give them his (ALAKIDI's) contact information if they got over there. MOHAMUD told ABDIQANI and one of the identified co-conspirators the most specifics about ALAKIDI. He told ABDIQANI that identified co-conspirator that ALAKIDI stays in Turkey, is a part of a group in Syria, and that he goes back and forth to Syria.

e) MOHAMUD told ABDIQANI and the identified co-conspirators that he (MOHAMUD)

was with ANF.

f) ABDIQANI and the identified co-conspirators asked MOHAMUD how much a gun costs in Syria. MOHAMUD told them it was between $1,600 and $1,700 for an AK-47.

g) ABDIQANI and the identified co-conspirators asked MOHAMUD how much money they would need to stay in Syria. MOHAMUD told them $4,000 to $5,000, but then said that was not really enough.

h) ABDIQANI and MOHAMUD talked about ABDIQANI needing citizenship and a passport to travel to Syria. MOHAMUD told ABDIQANI what he needed to do to get it. MOHAMUD told ABDIQANI that he needed to file for citizenship, wait a couple of months, do fingerprints, and then get a passport. MOHAMUD said they had this conversation early on after MOHAMUD got back from Syria. [MOHAMUD returned to the U.S. on June 8, 2014.]

14) On February 24, 2015, the FBI interviewed ABDIQANI about his knowledge of MOHAMUD's travel overseas in 2014. Based on the above statements from MOHAMUD on February 4, 2016, the Affiant believes ABDIQANI knowingly made false statements during the interview. ABDIQANI was advised of the federal violation to make false statements to federal agents pursuant to Title 18 U.S.C. 1001 which ABDIQANI acknowledged he understood and then provided the following information.

a) When asked what ABDIQANI knew of MOHAMUD's travel overseas, ABDIQANI stated MOHAMUD left the U.S. and went to Turkey but then ABDIQANI quickly stated MOHAMUD went to "Greek." The interviewing Agents clarified if ABDIQANI meant

9

Greece which ABDIQANI confirmed. ABDIQANI stated MOHAMUD went there on "vacation." ABDIQANI did not know where MOHAMUD stayed while there, just that MOHAMUD went to Greece on vacation. When interviewing Agents asked to confirm ABDIQANI also stated MOHAMUD went to Turkey, ABDIQANI strongly denied he said Turkey to the interviewing Agents. ABDIQANI emphatically stated he only said MOHAMUD went to Greece.

b) MOHAMUD had said nothing to ABDIQANI about his (MOHAMUD) trip overseas since returning to the U.S. The interviewing Agents asked ABDIQANI to confirm MOHAMUD had said absolutely nothing to ABDIQANI about his (MOHAMUD's) trip overseas given their close relationship and amount of time spent together since MOHAMUD returned to the U.S. ABDIQANI agreed MOHAMUD and he are close friends and have spent much time together since MOHAMUD returned to the U.S. but confirmed MOHAMUD had not said anything about his trip since he returned. When noted by the interviewing Agents that seemed unlikely, ABDIQANI replied that sometimes a friend decides not to talk about some things.

c) ABDIQANI had not talked to others about how MOHAMUD's brother ADEN died but had heard rumors. MOHAMUD told ABDIQANI that ADEN "got killed" but nothing more. ABDIQANI was provided a print-out of a Facebook post with text and photo dated June 4, 2014 in which the photo is an image of what appears to be ADEN reading a book with a smaller inset photo showing what appears to be ADEN deceased with a head bandage lying in a bed. ABDIQANI identified the photo as something he had seen. ABDIQANI does not believe the text accompanying it which states ADEN was killed in

10

Syria. ABDIQANI believes that statement is disrespectful.

d) When asked, ABDIQANI stated MOHAMUD has never mentioned Syria, including talk of traveling there.

15) Based on a review of Facebook records, three Facebook users have been identified who are all believed to be non-U.S. persons located in either Turkey or Syria. Facebook records reveal online communications dated April 17-25, 2014 between ADEN, MOHAMUD, and those three Facebook users for the purpose of facilitating MOHAMUD's travel from Turkey into Syria to join up with ANF (messages detailed below). Those three Facebook users are identified as follows:

a) Facebook User ID Aborshad Aborashaad (100007419253652) [hereinafter referred to as ABORASHAAD];

b) Facebook User ID الابـرش عـدنان (100003905470077) [عـدنان الابـرش] was translated by the FBI from Arabic as Adnan al-Abrash and hereinafter will be referred to as ALABRASH]; and

c) Facebook user العكيـــدي نضـــال (100006499100130) [نضـــال العكيـــدي] was translated by the FBI from Arabic as Nidal al-'Akidi and has been referred to above as ALAKIDI].

Your Affiant previously received records from Facebook for ALAKIDI's account on October 3, 2014 pursuant to a federal search warrant. On January 22, 2016, your Affiant completed preservation requests with Facebook for ABORASHAAD's and ALABRASH's accounts.

16) The following facts and assessments are noted for better context to understand online

11

communications cited below between ADEN, MOHAMUD, and the three ANF-linked travel facilitators of ABORASHAAD, ALABRASH, and ALAKIDI:

a) Records reveal that ADEN was Facebook "Friends" with ALABRASH beginning September 9, 2013, with ABORASHAAD beginning January 21, 2014, and with ALAKIDI beginning April 19, 2014. FBI investigation shows ADEN was in Syria by August of 2013.

b) From January 21, 2014 to March 16, 2014, ADEN and ABORASHAAD conducted multiple conversations, including one where ABORASHAAD references ADEN as "Abu Hasan." The Affiant recognizes the use of calling ADEN by the name Abu Hasan as an example of a kunya. A kunya is an Arabic naming custom in which one male adult refers to a fellow male adult as the father of his child. Fighters associated with FTOs use kunyas as a nom de guerre, or war name, to help conceal their true identities.

c) The FBI obtained Facebook subscriber records for ABORASHAAD which revealed the account was closed on May 11, 2015 but no other information. The FBI also obtained Facebook subscriber records for ALABRASH which revealed a cell phone number with a +963 prefix which Facebook verified on February 4, 2014. An open source search found that the country code for Syria is +963.

17) The following Facebook online communications illustrate ALABRASH's and ABORASHAAD's roles in helping to facilitate MOHAMUD's travel into Syria to join ANF.

a) On April 17, 2014, approximately two days before MOHAMUD arrived in Istanbul, there was online communication between the accounts of ADEN and ABORASHAAD.

b) During this time period your Affiant believes ALABRASH used ADEN's account during this conversation for the following reasons:

    i) the user of ADEN's account identifies himself twice as " 'Adnan al-Abrash;"

    ii) the original conversation was in Arabic which ADEN states multiple times elsewhere in records that he does not understand well; and

    iii) ADEN and ALABRASH are believed to be in close proximity during this period given their lack of Facebook online communications and due to records showing both ADEN's and ALABRASH's accounts having activity from the exact same IP address on April 17, 2014 within one hour of each other.

c) The following online communications were translated by the FBI from Arabic.

    i) ALABRASH (using ADEN's account) stated "I am 'Adnan al-Abrash" and then "Abu Hasan's brother wants to come to al-Rihaniya." Al-Rihaniya is understood to be Reyhanli, Turkey, a city on the border with Syria.

    ii) ABORASHAAD replied, "Why Abu Hasan?" ALABRASH (using ADEN's account) then replied, "My brother Abu Rashad, are you still there?" followed by "I am 'Adnan al-Abrash" and "Abu Hasan's brother wants to come to al-Rihaniya from Istanbul." To which ABORASHAAD replied, "Ok, give me his number if he has a phone."

    iii) The Affiant believes the translated name "Abu Rashad" is a variation of Aborashaad and is also a kunya.

d) On April 19, 2014 approximately one hour after MOHAMUD arrived at the Istanbul airport (according to online communications in Facebook records), additional online

13

communications took place between the accounts of ADEN and ABORASHAAD in which your Affiant believes ALABRASH was again using ADEN's account to facilitate MOHAMUD's travel into Syria. The following online communications were translated by the FBI from Arabic.

    i) ALABRASH (using ADEN's account) states "My brother, Abu Hasan asks whether you know a person in Istanbul." ABORASHAAD replied, "Yes, I know but he is a Syrian." ALABRASH (using ADEN's account) stated, "Give me the telephone number of the person in Istanbul." ABORASHAAD replied, "Ok, just a minute."

    ii) ALABRASH (using ADEN's account) then sent the following online communications: "Ok;" "This is the number of Abu Zayd, 'Adnan's uncle: [phone number provided];" "Talk to him;" and "Tell him that a Somali man went to Istanbul by a plane."

e) Later on April 19, 2014, ALABRASH (using his own account) had a series of online communications with ALAKIDI. The following communications were translated by the FBI from Arabic.

    i) ALAKIDI stated he was in Istanbul and then asked ALABRASH "Where is the Somali [MOHAMUD] staying?" to which ALABRASH replied "He is at the airport hotel."

    ii) ALABRASH then sent ALAKIDI the name and address of the Istanbul hotel where MOHAMUD was staying which was exactly the same information MOHAMUD sent to ADEN less than an hour before.

    iii) Shortly thereafter, MOHAMUD sent ADEN a photo of the hotel business card with

14

the hotel's address and phone number.

    iv) Approximately three minutes later ADEN sent the same photo to ABORASHAAD. ABORASHAAD then replied, "Ok, I am going to send the picture to Nidal" referring to Nidal ALAKIDI, another ANF linked travel facilitator established by other evidence.

f) Later on April 19, 2014, ALABRASH sent ALAKIDI a photo of MOHAMUD along with the statement "Here is the photo of 'Abd-al-Rahman." Later that same day ALAKIDI stated to ALABRASH that "I'll go to see him [MOHAMUD] tomorrow" and also "they will directly make reservation for him to Al-Rihaniya."

g) On April 20, 2014, ALAKIDI stated to ALABRASH that "Abd-al-Rahman is with me" and that the two were on their way to Antioch. Antioch is a city in southern Turkey approximately 27 miles from Reyhanli.

h) Thereafter on April 20, 2014, ABORASHAAD sent ADEN the following online communications in English stating, "We received your brother," "May be arrived at the evening," "To raehanea" [al-Rihaniya], and "Another time speak Arabic with me because I can't understand you."

i) On April 25, 2014, ALAKIDI informed ALABRASH via online communication that "this guy" [MOHAMUD] had entrusted him (ALAKIDI) with $1,000 for "his brother, Abd-al-Fattah" [ADEN]. ALABRASH responded that he would assist with the transfer of money and asked "who is the guy [MOHAMUD] with now?" ALAKIDI responded "the Front" "Nusra" [ANF]. ALABRASH stated "Good, may God facilitate his path."

j) Thereafter on May 12, 2014 ADEN asks ABORASHAAD, "do you know where

Abdirahman [MOHAMUD] is at" and then they decide to continue their communication via Skype. Skype is an online private video and voice chatting service.

k) Your Affiant believes these communications between ALABRASH and ABORASHAAD and with others as cited above indicate that they are ANF-linked facilitators who aided the travel of MOHAMUD into Syria.

18) ABDIQANI has direct association through Facebook to ABORASHAAD who, as illustrated above, directly coordinated with ALABRASH through Facebook on facilitation of travelers to Syria to join FTOs and specifically the ANF. A review of Facebook records for ABDIQANI, which the FBI previously obtained, revealed the following:

a) ABDIQANI initiated a "Friend" request to ABORASHAAD which he (ABORASHAAD) accepted on June 5, 2014. It is noted that on June 5, 2014 MOHAMUD was in Turkey preparing to return to the U.S. Based on FBI investigation, the Affiant believes ABDIQANI initiated this contact in order to help facilitate traveling to Syria to fight.

b) ABDIQANI removed ABORASHAAD as a "Friend" on June 23, 2014. It is noted that the FBI interviewed MOHAMUD on June 13, 2014 during which he (MOHAMUD) made false statements to conceal the true nature of his travel. Based on FBI investigation, the Affiant believes ABDIQANI removed ABORASHAAD as a Facebook "Friend" to help conceal his (ABDIQANI's) activity.

c) On September 19, 2014, ABDIQANI uploaded an image of a flag, which the Affiant recognized as the flag of the FTO al-Qa'ida, with the caption "I'm Somali and this is my

only flag."

19) The Affiant believes the FBI investigation indicates that ABDIQANI made contact with
ABORASHAAD in order to help further his plan to travel to Syria for the purpose of training
and fighting with an FTO. The Affiant further believes the investigation points to
ABORASHAAD's and ALABRASH's Facebook records containing online communications
with ABDIQANI or about his (ABDIQANI's) plans to travel to Syria to fight.

20) MOHAMUD and other identified co-conspirators, including ABDIQANI, are represented by
counsel. In December 2015, Assistant U.S. Attorneys contacted the attorneys representing
MOHAMUD, ABDIQANI, and other identified co-conspirators. Each stated that they have
not communicated with their respective clients by way of Facebook. However, as the results
of the requested search warrants could still produce protected communications covered by
the attorney-client privilege, a filter team not associated with the investigation or prosecution
will be put in place to be the first to flag potentially protected communications and a system
put in place to preserve any valid attorney-client privilege, as described in Attachment C.

## FACEBOOK

21) Facebook owns and operates a free-access social networking website of the same name that
can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts
with Facebook, and users can then use their accounts to share written news, photographs,
videos, and other information with other Facebook users, and sometimes with the general

public.

22) Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

23) Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

24) Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users,

or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

25) Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.

26) In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

27) Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos associated with a user's account will include all photos uploaded by that

user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

28) Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

29) If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

30) Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as web pages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

31) Facebook has a search function that enables its users to search Facebook for keywords,

usernames, or pages, among other things.

32) Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

33) Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

34) The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

35) Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

36) In addition to the applications described above, Facebook also provides its users with access

to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

37) Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.

38) Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

39) Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications. To the extent that Facebook may change the label it gives to the data it has called "Neoprint," I am referring to this same data previously

22

known as "Neoprint."

40) Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

41) Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

42) Therefore, the computers of Facebook are likely to contain all the material described below, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

43) The Affiant determined Facebook pages described herein to be publicly accessible via the

23

Internet if logged into a Facebook user account.

## CONCLUSION

44) Based on the above statements of fact, the Affiant believes there is probable cause that the Facebook accounts described herein contain statements by ABDIQANI and other known and unknown co-conspirators (e.g., ABORASHAAD and ALABRASH) and transactional data detailed in Attachment B revealing ABDIQANI's plans to travel to Syria for the purpose of training and fighting with an FTO which are fruits, instrumentalities, and evidence, including plans and concealment of their crimes. These offenses involve violations of Title 18 U.S.C. § 2339B (Providing and Conspiracy to Provide Material Support to Designated Foreign Terrorist Organization al-Nusrah Front) and of Title 18, United States Code § 1001, false statements involving international or domestic terrorism; which may be found within the social media accounts believed to be stored at premises controlled by Facebook which are described in Attachment A. Your Affiant therefore seeks to search those items to enable the FBI to identify and preserve evidence pertaining to those crimes.

SA Stephen L. Flowers
Special Agent
Federal Bureau of Investigation

SUBSCRIBED TO AND SWORN TO
BEFORE ME THIS 27th DAY
OF APRIL, 2016

Elizabeth Preston Deavers
U.S. Magistrate Judge
Southern District of Ohio

<u>ATTACHMENT A</u>

**DESCRIPTION OF PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the following Facebook accounts which are stored at premises owned, maintained, controlled, or operated by Facebook Inc., 1601 Willow Road, Menlo Park, California 94025:

1) Facebook User ID Aborshad Aborashaad (100007419253652) from inception of the account through April 27, 2016; and

2) Facebook User ID الابـــرش عـدنان (100003905470077) from inception of the account through April 27, 2016.

## ATTACHMENT B

## PARTICULAR THINGS TO BE SEIZED

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment B is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each of the administrator/s of Facebook account listed in Attachment A:

(a) All contact and personal identifying information, including for the above referenced for the above referenced user IDs or usernames or Facebook accounts associated with the account: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers and for the above reference group ID: group identification number, a list of users currently registered to the group, and Group Contact Info, including all contact information for the administrator/s of the group and a PDF of the current status of the group profile page.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos uploaded by the user IDs or Facebook accounts associated with the email addresses of the administrators, and all photos uploaded by any user that have that user tagged in them together with any and all photos identified by Facebook using Facebook's facial-recognition software to match the images uploaded by the user IDs;

(d) All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the administrator is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the administrator's access and use of Facebook applications for the administrator/s;

(e) All other records of communications and messages made or received by the administrator/s, including all private messages, chat history, video calling history, and pending "Friend" requests for the administrator/s;

(f) All "check ins" and other location information for the administrator/s;

(g) All IP logs, including all records of the IP addresses that logged into the account for the administrator/s;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook web pages and content that the administrator has "liked;"

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the administrator/s;

(l) All information about the administrator's access and use of Facebook Marketplace;

(m) The length of service (including start date), the types of service utilized by the administrator, and the means and source of any payments associated with the service (including any credit card or bank account number);

(n) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked

by the administrator/s;

(o) All records pertaining to communications between Facebook and any person regarding the Facebook account, including contacts with support services and records of actions taken.

**II. Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of the statutes listed on the warrant, including, for each account or service listed on Attachment B, information pertaining to the following matters:

a.      Communications and records relating to material support of terrorism.

b.      Identification of the other people, accounts, users or aliases involved in the material support of terrorism.

c.      Records relating to who created, used, or communicated with the account or identifier.

d.      Communications and records which aid in identifying the person using the account.

## ATTACHMENT C

## FILTER PROCEDURES

The Government seeks to search stored electronic information data, communications, images and related evidence ("ESI") to be obtained from the targets of the search warrant ("target"). Since the defendant and subjects of the investigation are or may be represented by counsel, filter procedures will be in place. With respect to existing legal privileges and rights of represented persons, the seizing agency and the U.S. Attorney's Office have established a filter team and material identification procedures to prevent the unlawful disclosure of privileged information, for example, materials which fall under the attorney-client privilege.

Privileged materials will not be provided directly to the prosecution team.

The seizing agency will conduct the search, including computers and electronic data storage devices. The search team will not be made up of case agents or prosecutors working on the matter and all will be instructed that if they encounter items clearly identified as containing privileged communications, they are not to read the contents of such materials. All ESI will be "mirror-imaged" (*i.e.*, a duplicate copy of all of the files in the computer will be created) and the original will be made available to attorney representing the defendant as soon as practicable. As part of the filter team, a designated filter attorney will be used in connection with the review of electronic data and the criminal prosecution team will not handle the review of seized materials. Seized materials will be collected and delivered to the filter team, who will examine the materials to determine whether any files, electronic or hard-copy, contain privileged attorney-client materials.

<u>Defendant and Targets will have an opportunity to assert a privilege before disclosure.</u>

To facilitate identification of privileged materials, the counsel for target be provided an inventory of seized items and will be asked to identify any files or records over which an attorney-client privilege is asserted by supplying a privilege log to the filter attorney. If the filter attorney determines that evidence is privileged without any exception to the any privilege and/or is outside the scope of the warrant, that material will be resealed and returned to the location from which it was seized or target and/or attorney. Materials within the scope of the warrant that are deemed not privileged by the filter attorney will be identified for the target's review so that the target may raise any objections before they are provided to the prosecution team. Materials in which the target claims a privilege, but which have not been so designated by the filter attorney, may be submitted to the Court for *ex parte* review and determination. Materials within the scope of the warrant which may be privileged but may also have a valid exception to the any privilege will be submitted to the Court for an *ex parte* review and determination as to if a valid exception to any privilege applies.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the

laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information

contained in this declaration is true and correct.  I am employed by Google Inc., and my official

title is _____. I am a custodian of records Google Inc.  I state that

each of the records attached hereto is the original record or a true duplicate of the original record

in the custody of Google Inc., and that I am the custodian of the attached records consisting of

_____ (pages/CDs/kilobytes). I further state that:

     a.     all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth, by, or from information transmitted by, a person with

knowledge of those matters;

     b.     such records were kept in the ordinary course of a regularly conducted business

activity of Google Inc. and

     c.     such records were made by Google Inc. as a regular practice.

     I further state that this certification is intended to satisfy Rule 902(11) of the Federal

Rules of Evidence.

_____    _____

Date                       Signature